Steven J. Reisman, Esq.
Jonathan Rotenberg, Esq.
Margaret J. McQuade, Esq.
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
Telephone: (212) 940-8800
sreisman@katten.com
jonathan.rotenberg@katten.com
margaret.mcquade@katten.com

Peter A. Siddiqui, Esq. (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661
Telephone:    (312) 902-5455
peter.siddiqui@katten.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SIZMEK INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10971 (SMB) |
| SIZMEK DSP INC., X Plus Two Solutions, LLC, X Plus One Solutions, Inc., WirelessDeveloper, Inc., Wireless Artist LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>Zeta Global Holdings Corp.,<br><br>Defendant. | Adv. Pro. No. _____<br><br>**ADVERSARY COMPLAINT** |

Sizmek DSP Inc. ("**Sizmek**"), X Plus Two Solutions, LLC, X Plus One Solutions, Inc., WirelessDeveloper, Inc., Wireless Artist LLC (collectively, "**Plaintiffs**"), each as debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "**Chapter 11 case**"), by and

through their undersigned attorneys, allege for their Complaint and claims for relief against defendant Zeta Global Holdings Corp. ("**Zeta**") as follows:

## I. NATURE OF THE ACTION

1. At a time when Plaintiffs are in urgent need of liquidity in order to finalize and submit a proposed plan of confirmation to the Court for approval, Zeta is improperly refusing to pay to Plaintiffs almost $2 million in consideration due and owing under a certain Asset Purchase Agreement, effective April 18, 2019, entered into by and between Plaintiffs and Zeta (the "**APA**").

2. Zeta's wrongful actions are diametrically opposed to the clear and unambiguous terms of the APA, have damaged Plaintiffs, pose a direct threat to their ability to confirm a plan and make distributions to their creditors, and threaten to burden and delay Plaintiffs' chapter 11 process. Plaintiffs seek and are entitled to specific performance, a money judgment, and injunctive relief to remedy Zeta's misconduct.

## II. PARTIES

3. Plaintiff Sizmek is a Delaware corporation headquartered in New York, New York and a debtor in the above-captioned Chapter 11 case.

4. Plaintiff X Plus Two Solutions, LLC is a Delaware limited liability company headquartered in New York, New York and a debtor in the Chapter 11 case.

5. Plaintiff X Plus One Solutions, Inc. is a Delaware corporation headquartered in New York, New York and a debtor in the Chapter 11 case.

6. Plaintiff WirelessDeveloper, Inc. is a Michigan corporation headquartered in New York, New York and a debtor in the Chapter 11 case.

7. Plaintiff Wireless Artist LLC is a Michigan limited liability company headquartered in New York, New York and a debtor in the Chapter 11 case.

8.  Defendant Zeta is a Delaware corporation with its principal place of business located in New York, New York.

### III. JURISDICTION AND VENUE

9.  The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated February 1, 2012. Plaintiffs consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order by the Bankruptcy Court in connection with this Adversary Proceeding to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Jurisdiction is also proper under the Court's Order Authorizing and Approving Private Sale of the Demand-Side Platform and the Data Management Platform Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and Granting Related Relief (Dkt. 143 at ¶ 33) and because the parties agreed to the exclusive jurisdiction of the Bankruptcy Court under APA § 13.3.

10. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV. BACKGROUND

#### A. Debtors' Advertising Distribution Platform Business

11. Prior to the Petition Date, Debtor Sizmek Inc., together with its Debtor affiliates (including all of the Plaintiffs) and non-Debtor affiliates, conducted a leading online advertising campaign management and distribution platform for advertisers, media agencies, and publishers.

12. Plaintiffs' media business consisted of running an online platform, called a Demand Side Platform ("**DSP**"), which enabled advertisers and their agencies to buy advertising placements on millions of websites across the globe. Plaintiffs also ran a Data Management

3

Platform ("**DMP**") that processes non-identifiable information for the purpose of developing audience segments for targeted advertising, and also optimizes that advertising and content displayed on individual sites.

13. The DSP and the DMP are interdependent. The DSP and DMP work off of each other, with the DMP determining which audiences advertisements are best suited for, and the DSP identifying where those advertisements should be placed, in order to most effectively reach the target audiences.[1]

B. **Debtors' Chapter 11 Case and Sale of the DSP to Zeta**

14. On March 29, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15. Starting almost immediately after the Petition Date, advertising inventory supply on the DSP began to decline precipitously. Faced with the prospect of the DSP shutting down, the Plaintiffs looked to sell the DSP and DMP on an urgent and expedited basis in order to preserve maximum value.

16. Ultimately, after thorough, though swift, negotiations, Plaintiffs and Zeta entered into the APA, effective April 18, 2019, pursuant to which Zeta acquired certain of Plaintiffs' assets related to the DSP and DMP.

17. On April 19, 2019, Plaintiffs filed a motion in this Court for approval of the sale of the DSP and DMP to Zeta. *See* Dkt. 78.

---

[1] Additional information regarding Debtors and their businesses, and the facts and circumstances supporting Debtors' chapter 11 cases, are set forth in in the Declaration of Sascha Wittler, Chief Financial Officer of Sizmek Inc., (I) in Support of Chapter 11 Petitions and First Day Pleadings, and (II) Pursuant to Local Rule 1007-2 [Dkt. 13], filed on April 2, 2019, and the Supplemental Declaration of Sascha Wittler, Chief Financial Officer of Sizmek Inc., (I) in Support of Chapter 11 Petitions and First Day Pleadings, and (II) Pursuant to Local Rule 1007-2 [Dkt. 58], filed on April 9, 2019.

4

18. The Court granted the motion on April 29, 2019. *See* Dkt. 143. In so holding, the Court stated that the APA, "shall inure to the benefit of Sellers, their estates and creditors," as well as Zeta. *Id.* ¶5.

19. The sale closed on May 1, 2019 (the "**Closing Date**").

C. **Zeta's Wrongful Breach of the APA**

   (1) **Relevant Provisions of the APA**

20. In order to properly value the Plaintiffs' business and compensate Plaintiffs for the work provided and services generated in connection with the DSP and DMP, in addition to certain fixed consideration under the APA, Plaintiffs and Zeta negotiated and agreed upon a contingent payment structure tied to Plaintiffs' outstanding accounts receivable and unbilled services as of closing.

21. The formula for calculating the contingent payments that Zeta owed to Plaintiffs is set forth in Section 3.3 of the APA:

> Section 3.3  Contingent Payments. Purchaser shall make a payment in cash to Sellers (or their designee(s)) on the dates set forth below (each such payment, a "Contingent Payment" and collectively with all Contingent Payments together with the Closing Cash Payment, the "Cash Purchase Price") from amounts collected by Purchaser or any Seller on or after the Closing in respect of Shared Accounts Receivable, as follows:
>
>   (a) In the event that the balance of Net Shared Accounts Receivable (as reasonably determined by Sellers and Purchaser (in consultation with the First Lien Agent) at Closing) is greater than or equal to Thirty Million U.S. Dollars ($30,000,000):
>
>     (i) fifty percent (50%) of the aggregate amount of collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the other fifty percent (50%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Purchaser until a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable has been collected;

5

(ii) after a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable has been collected, seventy percent (70%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the remainder shall be for the benefit of Purchaser until a total of Twenty Million U.S. Dollars ($20,000,000) of Shared Accounts Receivable has been collected; *and*

(iii) after a total of Twenty Million U.S. Dollars ($20,000,000) of Shared Accounts Receivable has been collected, sixty percent (60%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the remainder shall be for the benefit of Purchaser until an amount equal to the Net Shared Accounts Receivable has been collected.

(b) In the event that the balance of Net Shared Accounts Receivable (as reasonably determined by Sellers and Purchaser (in consultation with the First Lien Agent) at Closing) is less than Thirty Million U.S. Dollars ($30,000,000):

(i) fifty percent (50%) of the aggregate amount of collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the other fifty percent (50%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Purchaser until a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable has been collected; and

(ii) after a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable have been collected, Purchaser shall be entitled to receive the percentage of the aggregate Net Shared Accounts Receivable obtained by dividing (A) Seven Million U.S. Dollars ($7,000,000) by (B) the difference of Net Shared Accounts Receivable minus Ten Million U.S. Dollars ($10,000,000), and the remainder shall be for the benefit of Sellers (or their designee(s)) until an amount equal to the Net Shared Accounts Receivable has been collected.

22. APA Section 1.1 defines "**Net Shared Accounts Receivable**" as: "(a) the Shared Accounts Receivable minus (b) the Media Accounts Payable."

23. APA Section 1.1 defines "**Shared Accounts Receivable**" as:

"…*the Accounts Receivable of Sellers attributable to, or arising out of sales or services provided by Sellers during, the period ending on or prior to April 30, 2019 (whether or not invoiced as of such date)*, which includes, for the avoidance of doubt, invoiced Accounts Receivable of Sellers outstanding as of the Closing and Accounts Receivable of Sellers that is

6

invoiced after the Closing that is attributable to, or arising out of sales or services provided by Sellers on or prior to April 30, 2019." (Emphasis added).

24. APA Section 1.1 defines "**Accounts Receivable**" as:

"… *with respect to any Seller and a particular date, (i) any and all accounts receivable, trade accounts and other amounts (including overdue accounts receivable)* owed to such Seller relating to, or arising in connection with, the operation and conduct of, the Business or otherwise and any other similar rights of such Seller to payment from third parties whether or not invoiced as of such date, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to such Seller; (ii) all other accounts or notes receivable of such Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, *in each case that have not been satisfied or discharged prior to the close of business on the day immediately preceding such date or have not been written off or sent to collection prior to the close of business on the day immediately preceding such date* (it being understood that the receipt of a check prior to the close of business on the day immediately preceding such date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby)." (Emphasis added).

25. APA Section 2.3 defines "**Media Accounts Payable**" as:

"…all trade accounts payable of Sellers owed to media vendors of Sellers which has been accrued or invoiced during the calendar month of April 2019 (whether or not invoiced as of such date)…."

26. These terms are plain and unambiguous. Subsections (a) and (b) of section 3.3 provide two alternative waterfalls for determining the division and distribution of the contingent payments. If the balance of Net Shared Accounts Receivable, as determined by Sellers and Purchaser *at Closing,* is equal to or greater than $30 million, then Shared Accounts Receivable are distributed under the waterfall in subsection (a). If the Net Shared Accounts Receivable is less than $30 million, the Shared Accounts Receivable are distributed under the waterfall in subsection (b).

7

27. As the APA spells out, the Net Shared Receivables amount—to be mutually agreed upon *at Closing*—was to include any and all receivables for services rendered through April 30, 2019, whether or not an invoice had yet been issued or was past due. Indeed, the term "Accounts Receivable" is defined in the broadest possible sense, and includes, *inter alia*, overdue accounts receivable. APA § 1.1. The defined term only excludes amounts that have been "written off or sent to the collection *prior to the close of business on the day immediately preceding such date [i.e., April 30, 2019]*." *Id.* (Emphasis added).

28. Furthermore, the APA also clearly placed both the risk and burden of collection squarely on Zeta and restricted Zeta's ability to take any action that might reduce the amount of Shared Accounts Receivable.

29. Under APA §3.3, Zeta is required to diligently collect all Shared Accounts Receivable, "hold an applicable percentage of cash received from such collections of Shared Accounts Receivable in trust for the benefit of Sellers and the First Lien Agent, and [] not take any action or fail to take any action with the intent of, or that is reasonably likely to have the effect of, reducing the amount of any Contingent Payment (including, without limitation, discounting forgiving, deferring, writing off, settling, or otherwise compromising any Shared Accounts Receivable) …"

30. The distribution structure under Section 3.3 also requires Zeta to pay to Plaintiffs the maximum amount of contingent payments available to them under Section 3.3 before Zeta can recover a single dollar of the Media Accounts Payable, which were assumed under APA. Net Shared Accounts Receivable (*i.e.*, Shared Accounts Receivable minus Media Accounts Payable) are relevant for determining only: (1) whether the waterfall under subsection (a) or subsection (b) applies (APA §§ 3.3(a) and 3.3(b)); and (2) the total amounts of contingent payments to be paid

8

out through the waterfall (APA §§ 3.3(a)(iii) and 3.3(b)(ii)).  As provided under Sections 3.3(a)(i)-(iii) and 3.3(b)(i)-(ii), however, the actual dollar distributions under the waterfall are required based on the collection of Shared Accounts Receivable, not Net Shared Accounts Receivable.  Zeta is thus not entitled to recover the Media Accounts Payable "off the top" of the collections, but rather, it recovers them only after Plaintiffs have received all of the contingent payments due and owing to them under Section 3.3.

### (2)    Zeta Refuses to Make the Contingent Payments

31.    Prior to the Closing Date, the parties had many discussions and negotiations regarding the balance of the Net Shared Accounts Receivable as of the Closing Date.  Zeta, for its part, had access to all materials necessary to make an informed determination regarding the balance of the Net Shared Accounts Receivable, and could and did review such materials and otherwise conducted substantial due diligence of Plaintiffs books and records prior to the Closing Date.

32.    Based upon this due diligence, the parties agreed that the balance of the Shared Accounts Receivable as of the Closing Date was $38,608,271 and that the balance of the Media Accounts Payable was $4,800,392.  Based upon these figures, the balance of the Net Shared Accounts Receivable at closing was $33,807,879.

33.    Because the Net Shared Accounts Receivable exceeded $30,000,000 at closing, the waterfall provisions set forth in APA §3.3(a) governed the terms of the contingent payments, rather than the terms set forth in APA §3.3(b).

34.    By way of illustration, assuming all of the Shared Accounts Receivable of $38,608,271 were collected, the distribution order and breakdown under Section 3.3(a) would be as follows:

|  | **Plaintiffs** | **Zeta** |
|---|---|---|
| First $10 million (§ 3.3(a)(1)): | $5 million | $5 million |
| Second $10 million (§ 3.3(a)(ii)): | $7 million | $3 million |
| Next $13,807,879 (Until Net Shared Accounts Receivable cap) (§ 3.3(a)(iii)): | $8,284,727 | $5,523,151 |
| Repayment of Media Accounts Payable: |  | $4,800,392 |
| Total contingent payments: | $20,284,727 | $18,323,543 |

35. Only after Zeta collects $33,807,879 in Shared Accounts Receivable and makes the distributions in the first three levels of the waterfall outlined above, is it permitted under the APA for Zeta to apply Shared Accounts Receivable to the Media Accounts Payable.

36. After the Closing Date, Zeta initially proceeded to report on and pay over the Shared Accounts Receivable, as required under the APA. Over the last several months, however, Zeta has wrongly refused to make any additional payments.

37. As of December 15, 2019, Zeta had collected $33,247,272 in Shared Accounts Receivable.

38. Based upon this amount, under the waterfall in Section 3.3(a) of the APA, Zeta is required to make contingent payments to Plaintiffs in the amount of $19,948,363.20. Under the APA, Zeta is required to pay Plaintiffs any and all contingent payments due and owing to them within one week after receiving a report from Plaintiffs with their calculations of Accounts Receivables collected to date. Plaintiffs have fully complied with any and all prerequisites to receiving the contingent payments under the APA.

39. As of the date of this complaint, however, Zeta had made contingent payments to Plaintiffs totaling only $17,952,292. Zeta is liable to Plaintiffs for the difference—

10

$1,996,071.20—as well as 60% of any additional Shared Accounts Receivable collected since December 15, 2019, up to a total of $33,807,879 in collections.

40. Plaintiffs have repeatedly demanded payment of the outstanding contingent payments from Zeta. Zeta, however, has refused to tender these due and owing amounts and affirmatively repudiated its obligations to make additional payments under Section 3.3 of the APA, thus materially breaching the agreement.

41. Plaintiffs have made numerous attempts to resolve this issue amicably with Zeta, but despite such efforts, the parties are at an impasse.

42. To make matters worse, as noted above, Zeta is required to "hold an applicable percentage of cash received from such collections of Shared Accounts Receivable in trust for the benefit of Sellers," and Zeta's inexplicable noncompliance with its payment obligations under the APA also raises serious questions about whether Zeta is further breaching the APA by failing to adhere to its requirement to hold collected Shared Accounts Receivable in trust. APA § 3.3(b).

43. Zeta has also failed to fulfill its obligations under the APA to "diligently collect all Shared Accounts Receivable of the Business in the Ordinary Course of Business and pursue the payment thereof." APA § 3.3(b). Rather than acknowledge as much, however, Zeta has instead attempted to excuse its failure to collect and payout the Shared Accounts Receivable by claiming baseless reductions to the acknowledged $38,608,271 balance at closing that have no basis in the APA.

44. Plaintiffs are in bankruptcy and in dire need for the contingent payments owed under the APA. Without these funds, Plaintiff may not have sufficient liquidity to organize and receive confirmation of the reorganization plan that it is currently in the process of negotiating.

45. Zeta's withholding of such funds damages Plaintiffs and jeopardizes Plaintiffs' ability to emerge from bankruptcy in a timely and efficient manner, and by extension, also threatens to irreparably harm Plaintiffs' creditors.

## COUNT I
### (Specific Performance)

46. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

47. Section 13.3 ("Specific Performance") of the APA provides that,

> "…It [is] agreed that each party hereto and the First Lien Agent shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and ***to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court*** without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each party hereto hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to each such party is entitled at law or in equity." (Emphasis added).

48. Plaintiffs have substantially performed all of their contractual obligations under the APA and are ready, willing, and able to perform all remaining obligations.

49. It is within Zeta's power to pay the contingent payments requirements of APA § 3.3.

50. There is no adequate remedy at law for Zeta's failure to perform, as such failure may result in Plaintiffs' inability to obtain the Court's approval of a bankruptcy plan and deprive Plaintiffs' estates of expected cash flow.

51. Accordingly, the Court should enter require Zeta's specific performance of the APA.

## COUNT II
**(Injunction)**

52. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

53. Zeta should be enjoined from withholding the funds owed to Plaintiffs under the APA.

54. Plaintiffs are likely to succeed on the merits of their breach of contract and specific performance claims (and, by extension, have presented a sufficiently serious question going to the merits of the claims) because Zeta violated the unambiguous terms of the APA, because the APA expressly provides for the remedy of specific performance, and because Zeta's failure to perform threatens Plaintiffs' ability to confirm a bankruptcy plan.

55. Absent an injunction, Plaintiffs will be irreparably (and imminently) harmed because the funds that Zeta owes Plaintiffs under the APA are critical to Plaintiffs' ability to confirm a bankruptcy plan and emerge from bankruptcy. Zeta may also be in the process of dissipating the funds that it is required to hold "in trust for the benefit of the [Plaintiffs]" under Section 3.3(b) of the APA, and may not have any assets with which to satisfy a judgment unless Zeta's wrongful conduct is immediately halted.

56. Section 13.13 of the APA expressly provides for injunctive relief in such circumstances, as it states, in pertinent part:

> "The parties hereto agree that ***irreparable damage would occur*** and that the parties hereto and the First Lien Agent would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each party hereto and the First Lien Agent ***shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement***…" (Emphasis added).

13

57. The balance of the equities tips decidedly in Plaintiffs' favor because Zeta's actions threaten not only Plaintiffs' interests, but the interests of all parties involved in the bankruptcy proceeding, including creditors.

58. Plaintiffs are likely to confirm a plan and make distributions to their creditors if Zeta complies with its APA obligations. Thus, an injunction restraining Zeta from deviating with its prior compliance with APA §3.3(a) is in the public interest.

## COUNT III
**(Breach of Contract)**

59. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

60. The APA constitutes a valid and binding contract between Plaintiffs and Zeta.

61. Plaintiffs have performed all promises, conditions, and covenants required to be performed in accordance with the terms and conditions of the APA.

62. Zeta has breached APA §3.3 by failing to pay Plaintiffs certain contingent payments in accordance with the waterfall outlined in APA §3.3 (a), and failing to diligently collect all of the Shared Accounts Receivable and hold an applicable percentage of cash received from that collection in trust for Plaintiffs' benefit as required under APA § 3.3(b).

63. As a direct and proximate result of Zeta's breaches, Plaintiffs have been damaged in the amount of at least $1,996,071.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray for relief as follows:

1. Injunctive relief enjoining Zeta from withholding payments owed to Plaintiffs under the APA;

2. An order requiring Zeta's specific performance of the APA;

3. Money damages for Zeta's breach of the APA in an amount to be determined at trial, but of at least $1,996,071;

4. Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred in connection with this action;

5. Pre-judgment and post-judgment interest as permitted by law; and

6. Such other and further relief as the Court may deem just and proper.

Dated: February 14, 2020
      New York, NY

Respectfully Submitted,

By /s/Steven J. Reisman

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman
Jonathan A. Rotenberg
Margaret J. McQuade
575 Madison Avenue
New York, NY 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8876
Email: sreisman@katten.com
      jonathan.rotenberg@katten.com
      margaret.mcquade@katten.com

Peter A. Siddiqui, Esq. (admitted *pro hac vice*)
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5455
Email: peter.siddiqui@katten.com

*Counsel for Plaintiffs*